Opinion issued November 2, 2006 




 













In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-05-00556-CV
__________
 
MONICA RUIZ, Appellant
 
V.
 
TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,
Appellees
 

 
 
On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2003-07129J
 

 
 
OPINION ON REHEARING
          We grant appellee’s motion for rehearing, withdraw our opinion dated August
3, 2006, and substitute this opinion in its place.
          In this accelerated appeal,


 appellant, Monica Ruiz, challenges the trial court’s
decree, entered after a bench trial, terminating her parental rights to her minor child,
A.J. In two issues, Ruiz contends that the evidence is legally and factually
insufficient to support the trial court’s findings that she knowingly placed or
knowingly allowed A.J. to remain in conditions or surroundings which endangered
the physical or emotional well-being of A.J.,


 that she engaged in conduct or
knowingly placed A.J. with persons who engaged in conduct which endangered the
physical or emotional well-being of A.J.,


 and that termination of the parent-child
relationship between Ruiz and A.J. was in A.J.’s best interest.



          We reverse the portion of the decree terminating the parent-child relationship
between Ruiz and A.J. 
Factual and Procedural Background
          On September 9, 2003, the Texas Department of Family and Protective
Services (“DFPS”) filed its petition to terminate Ruiz’s parental rights to her son, A.J. 
During the trial, DFPS case worker Tammy Brown testified that in June 2003, an
individual made a referral to DFPS “stating that [A.J.] was being left with his paternal
great grandmother for periods of time where [Ruiz’s] whereabouts were unknown.” 
Brown also stated that “it was alleged [that] there were cigarette burns on [A.J.’s] arm
and that [Ruiz] could not give a consistent explanation for those said cigarette burns.” 
DFPS then removed A.J. “after a period of time because Ruiz took [A.J.] from the
care of the grandmother and they didn’t know where [A.J.] was and then, about two
months later, [A.J.] was removed and was returned.”
          Brown further testified that after DFPS removed A.J., it gave Ruiz a family
service plan, which stated that DFPS became involved because “it was reported that
there were allegations of physical abuse.” As part of this plan, DFPS instructed Ruiz
to attend individual counseling sessions, family counseling sessions with her
boyfriend, anger management classes, parenting classes, and a psychiatric follow-up. 
DFPS also instructed Ruiz to participate in a drug assessment and random urinalysis
exams. Although Ruiz had attended some individual counseling sessions and some
anger management classes, Ruiz would have to begin the eight-week session of
anger-management classes again because she had missed so many of them. Brown
stated that Ruiz went to the Mental Health and Mental Retardation Authority
(“MHMRA”) one week before trial, but that “they did not see [Ruiz] and there was
no time for [Brown] to follow-up for why [MHMRA] wouldn’t follow through with
services on [Ruiz], to find out what the reasoning was on that.” Brown agreed that
Ruiz had completed the parenting classes required in the plan and that Ruiz also
completed a required narcotics assessment “and had a recommendation of
psychological on it,” but that “there wasn’t time to follow through with that
recommendation.”


 Brown also noted that Ruiz did attend some family counseling
sessions. 
          Brown also testified that DFPS requested that Ruiz complete “some” of these
services shortly after it removed A.J. in September 2003. DFPS also requested that
Ruiz complete these services in July 2004, and, in July 2004, DFPS granted Ruiz’s
request for more time to complete these services. Brown stated that she was not sure
whether Ruiz “would ever follow through to complete the services at this point,” that
DFPS had “given her every opportunity to complete services,” that DFPS had “put[]
family based services in place to where they were going to [Ruiz’s] home,” and that
these services “were not followed through with.”
          After DFPS removed A.J. in September 2003, he was placed with his paternal
great grandmother, “Miss Hernandez.”


 A review of the record reveals that at some
point in December 2003, the trial court placed A.J. with Marcella Chappa, Ruiz’s
cousin, with whom Ruiz was living at the time. The record does not disclose why
A.J.’s placement was modified, and DFPS contends that it never agreed with this
placement. One of the stipulations for this placement was that Ruiz could not be left
unsupervised with A.J. However, when Brown visited the Chappa home in January
2004, she found Ruiz alone with A.J., who was in a “very soaked” diaper “as though
he had not been changed since the previous day.” Brown also noted that A.J. had
“some bruising on his face and a gash on one of his eyes that was fairly deep . . . and
looked like it should have some medical attention.” Ruiz told Brown that A.J. had
fallen down and that, in Ruiz’s opinion, the gash “didn’t look like it was that serious.” 
Although Brown removed A.J. from the Chappa home and took him to a clinic to be
assessed, there are no medical records or any testimony in the record concerning the
results of this medical assessment or whether, in fact, A.J. needed medical attention. 
A.J. was then returned to the Hernandez home until trial, which was held in
November 2004.
          Brown asked the trial court to terminate Ruiz’s parental rights and asserted that
termination would be in A.J.’s best interest for the following reasons:
          Ruiz doesn’t have a stable place to live at this point. She is not
employed. She has a possibility of some domestic violence going on
in her home situation with her current boyfriend. She has not
completed her services as we agreed in mediation. She’s just proven to
have a very unstable life style.



 
Brown further asserted that A.J. was “an adoptable child,” that he “is extremely
bonded with the paternal side of his family, especially his great grandmother [Miss
Hernandez],” and that there is a very large extended family that visits him frequently
at Hernandez’s home. Brown also stated that she had previously spoken with Ruiz
and A.J.’s father concerning termination of their parental rights and that both Ruiz
and A.J.’s father had mentioned Chris Levin, a cousin, as a person who would be “a
good choice” for A.J.
          Brown testified that she had confronted Ruiz about the possibility of domestic
violence with her current boyfriend, Ismael Castone, with whom Ruiz was currently
living, that Ruiz initially denied that there was domestic violence, but that Ruiz
eventually admitted that there had been “some domestic violence” in the relationship. 
Brown stated that Miss Hernandez and Hernandez’s daughter had also told her that
there was domestic violence in Ruiz’s current relationship. Specifically, Hernandez
told Brown that on one occasion Ruiz had been brought to her home by Houston
Police Officers and that Ruiz had bruising on her face. Ruiz allegedly told Hernandez
that Ruiz and Castone had been fighting, Castone had dropped her off on the freeway,
and police officers had picked her up and brought her to the Hernandez home. 
          On cross-examination, Brown stated that the “major issue” with Ruiz was “her
instability, as far as not having a place to live” and Ruiz’s “just dropping in and out
of the services.” Brown stated that she had not given consideration to the fact that
Ruiz had recently re-engaged in the services prescribed in the plan because, in her
opinion, it was “just too late.” Brown stated that Ruiz had suggested Marecella Soliz,
Castone’s mother, as a possible placement for A.J., but that DFPS had not done a
home study on Soliz. Brown stated that she had concerns about Ruiz’s current living
arrangements with regard to domestic violence, but Brown conceded that, to her
knowledge, no criminal charges had been filed against Castone. 
          Ruiz testified that A.J. was born in November 2001, while she was in a home
pregnancy placement. Sometime around January 2002, Ruiz moved in with
Hernandez, and Ruiz remained at Hernandez’s home until approximately March
2003, when Ruiz moved in with a roommate. Ruiz agreed that since moving out of
Hernandez’s home in March 2003, she had not provided A.J. with a stable home. 
Ruiz subsequently “found out [her] roommate wasn’t the person to have around [her]
son,” and she placed A.J. in Hernandez’s care in the beginning of April 2003 because
she did not know anyone else and she “felt like [he would] be better with [Hernandez]
for the time.” Ruiz had an agreement with Hernandez to leave A.J. with Hernandez
until she “got a better place for [them] to live” and that, prior to leaving A.J. at
Hernandez’s home, she had never left A.J. with anyone else. When she placed A.J.
with Hernandez, Ruiz “was trying to make [her]self better,” she “wasn’t frequently
leaving,” she “would go and visit [A.J.] the days [she] was off from work and
school,” and she “would take him [to] where [she] was staying at to spend some time
with him.” During this time, Ruiz visited A.J. “a few times during the week.” 
          In regard to the alleged cigarette burns, Ruiz stated that when she picked A.J.
up from Hernandez, Hernandez told her that the marks were insect bites that had
become infected. Ruiz returned A.J. to Hernandez “probably like that week or after
or less,” and “a few days later” got a call stating that A.J. was “removed out of [her]
custody.” In regard to the referral made to DFPS, Ruiz stated that at first she “didn’t
want to go along with the services” and that she “kind of blew it off,” but she then
decided to participate in the services. In regard to the family services plan, Ruiz
admitted that “in the beginning” she was “stubborn” but that a few days later she tried
to make arrangements to complete the services. Initially, Ruiz moved in with her
mother because she thought that she would be a big help, but she was not. She then
moved in with Chappa. Ruiz enrolled in school, and Chappa provided her room and
board in exchange for Ruiz’s taking care of Chappa’s four children. Ruiz stated that
this made it hard to complete her services. Ruiz moved out of Chappa’s home in
March 2004, and then became pregnant by her new boyfriend, Castone. 
          Ruiz also testified that “from the very beginning” of this pregnancy there was
a concern about the possibility of a miscarriage “so [she] was placed on bed rest.” 
She was “sick for a very good time” and “wasn’t able to do anything.” After Ruiz had
a miscarriage in July 2004, she “jumped right back into [her] services” and did her
best to complete as much of the plan as possible. She conceded that from March to
May 2004 she did not keep in touch with her case worker and did not inform her that
she was having medical problems, but Ruiz did stay in contact with Hernandez. Ruiz
stated that there was a period of approximately one to one and one-half weeks in
which she did not visit A.J. at Hernandez’s home, and this was when she was going
through her miscarriage. Prior to that, she would visit A.J. three to four times a week,
and during the months before trial, she visited A.J. twice a week for the time that she
was permitted.
          For the eight months preceding trial, Ruiz lived with Castone and was not
working or paying rent. Although she had time to complete the services, she did not. 
Ruiz also stated that DFPS had provided her with some home services. She agreed
that A.J.’s paternal relatives loved him, that she had not provided A.J. with a stable
home since she had left him at Hernandez’s home, and that Hernandez had provided
A.J. with his basic needs. Ruiz noted that she would need two more months to
complete the family services plan because her anger management classes would take
eight weeks. She explained that she intended to marry Castone, Castone had a job,
Castone supported her, and she and Castone lived with his parents. Ruiz asked the
court to consider placing A.J. with her prospective in-laws because they could
provide a nice home and had a stable marriage.
          In regard to Brown’s visit to Chappa’s home, Ruiz testified that she did not
remember whether A.J. had a soiled diaper, but that she had treated the gash on A.J.’s
head with neosporin and alcohol and that she thought the gash would be fine. 
However, Ruiz agreed that A.J.’s removal from Chappa’s home was “justified.” She
denied that she had been battered by Castone, and instead contended that Houston
Police Officers had picked her up on one occasion because they thought she was a
minor. Ruiz contended that the officers then gave her a ride to Hernandez’s home so
that she could visit A.J. She stated that she told Brown that she had an accident and
had hit herself on a dresser when she was moving. Ruiz maintained that her current
home was free of domestic violence. 
          In regard to the psychiatric requirements of the family services plan, Ruiz
stated that when she went to MHMRA, she reported that she was depressed, would
benefit from assistance, and “had experience with alcohol and drugs.” However, she
subsequently received a letter from MHMRA, which stated that she did not qualify
for a psychiatric evaluation. Ruiz explained that she believed that she had satisfied
DFPS’s requirement to follow through with psychological and psychiatric
evaluations. Ruiz stated that her individual counseling was ongoing, she had
completed her parenting classes, and she learned a lot about discipline, nutrition, and
child care from her classes. She also testified that if she were to take a drug test, she
would be “clean.” 
          Ruiz admitted that she had been repeatedly told that she could lose her son if
she did not complete the service plan, that she had reported that she was depressed,
that she had drunk alcohol “as early” as April 13 and smoked marihuana “as early”
as April 14, that she was only nineteen years old, and that she had not completed her
classes because of inconsistent attendance. 
          Mike Murray, a family therapist and DFPS’s witness, testified that he had seen
Ruiz in couples and individual therapy, and he recommended returning A.J. to Ruiz
based on his experience with Ruiz, her progression in counseling, and his evaluation
of her abilities, parenting skills, attitude, temper, and resources. Murray saw Ruiz 15
or 16 times out of 23 scheduled visits. His recommendation was based on Ruiz’s
commitment that she would continue to see him and his agreement with her that
finances would not be a consideration. Murray said that third parties had alleged the
existence of domestic violence in Ruiz’s relationship with Castone, but that based on
his sessions with Ruiz, it was his opinion that there was no concern or issue of
violence or abuse.
          Patricia Jiminez, A.J.’s great aunt, testified that police officers had previously
arrived at her home with Ruiz, Ruiz had told her that Ruiz and Castone had gotten
into an argument, Ruiz had a mark on her face, and the police officers had found Ruiz
on the roadway. Jiminez stated that Ruiz called Castone, and Ruiz had told Jiminez
that she was not going back to Castone.
          Lucious Walter, the appointed child advocate, testified that it was in A.J.’s best
interest to terminate Ruiz’s parental rights. Walter recommended that A.J. be placed
with his paternal uncle, Chris Levin.  
          Following the bench trial, the trial court signed a decree, terminating Ruiz’s
parental rights to A.J. on the following grounds:   
7.1     The Court finds by clear and convincing evidence that
termination of the parent-child relationship between [Ruiz] and
the child, [A.J.], the subject of this suit is in the child’s best
interest.
 
7.2     Further, the Court finds by clear and convincing evidence that
[Ruiz] has:
 
                    7.2.1.           knowingly placed or knowingly allowed the
child to remain in conditions or surroundings
which endanger the physical or emotional
well-being of the child, pursuant to
§ 161.001(1)(D) of the Texas Family Code;



 
                    7.2.2.           engaged in conduct or knowingly placed the
child with persons who engaged in conduct
which endangers the physical or emotional
well-being of the child,” pursuant to
§ 161.001(1)(E) of the Texas Family Code;


 
 
Standard of Review
          A parent’s right to “the companionship, care, custody, and management” of her
children is a constitutional interest “far more precious than any property right.” 
Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982). The
United States Supreme Court has emphasized that “the interest of parents in the care,
custody, and control of their children—is perhaps the oldest of the fundamental
liberty interests recognized by this Court.” Troxel v. Granville, 530 U.S. 57, 65, 120
S. Ct. 2054, 2060 (2000). Likewise, the Texas Supreme Court has also concluded
that “this natural parental right” is “essential,” “a basic civil right of man,” and “far
more precious than property rights.” Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). 
Consequently, termination proceedings must be strictly scrutinized, and “involuntary
termination statutes are strictly construed in favor of the parent.” Id. 
          Because termination “is complete, final, irrevocable, and divests for all time
that natural right . . . the evidence in support of termination must be clear and
convincing before a court may involuntarily terminate a parent’s rights.” Id. (citing
Santosky, 455 U.S. at 747, 102 S. Ct. at 1391; Richardson v. Green, 677 S.W.2d 497,
500 (Tex. 1984)). Clear and convincing evidence is “the measure or degree of proof
that will produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established.” Tex. Fam. Code Ann. § 101.007
(Vernon 2002); In re J.F.C., 96 S.W.3d 256, 264 (Tex. 2002). Because termination
findings must be based upon clear and convincing evidence, not simply a
preponderance of the evidence, the Texas Supreme Court has held that the traditional
legal and factual standards of review are inadequate. In re J.F.C., 96 S.W.3d at
264–66. Instead, in conducting a legal-sufficiency review in a
termination-of-parental-rights case, we must determine whether the evidence, viewed
in the light most favorable to the finding, is such that the fact finder could reasonably
have formed a firm belief or conviction about the truth of the matter on which the
State bore the burden of proof. See id. at 266. In viewing the evidence in the light
most favorable to the judgement, we “must assume that the fact finder resolved
disputed facts in favor of its finding if a reasonable fact finder could do so,” and we
“should disregard all evidence that a reasonable fact finder could have disbelieved or
found to be incredible.” In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005) (citing In re
J.F.C., 96 S.W.3d 266). In conducting a factual sufficiency review in a
termination-of-parental-rights case, we must determine whether, considering the
entire record, including both evidence supporting and evidence contradicting the
finding, a fact finder reasonably could have formed a firm conviction or belief about
the truth of the matter on which the State bore burden of proof. Id.; In re C .H., 89
S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is
such that a reasonable fact finder could not have resolved the disputed evidence in
favor of its finding. In re J.F.C., 96 S.W.3d at 266–67. “If, in light of the entire
record, the disputed evidence that a reasonable fact finder could not have credited in
favor of the finding is so significant that a fact finder could not reasonably have
formed a firm belief or conviction, then the evidence is factually insufficient.” Id. at
266. 
Grounds for Termination
          In proceedings to terminate the parent-child relationship brought under section
161.001 of the Texas Family Code, DFPS must establish, by clear and convincing
evidence, one or more of the acts or omissions enumerated under subsection (1) of
section 161.001 and that termination is in the best interest of the child. Tex. Fam.
Code Ann. § 161.001 (Vernon Supp. 2005). Both elements must be established, and
termination may not be based solely on the best interest of the child as determined by
the trier of fact. Tex. Dep’t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987). Here, the trial court, in ordering the termination of Ruiz’s parental rights as
to A.J., expressly found that Ruiz “knowingly placed or knowingly allowed [A.J.] to
remain in conditions or surroundings which endanger[ed] the physical or emotional
well-being of [A.J.],” that Ruiz “engaged in conduct or knowingly placed [A.J.] with
persons who engaged in conduct which endanger[ed] the physical or emotional
well-being of [A.J.],” and that “termination of the parent-child relationship between
[Ruiz] and the child, [A.J.], . . . [was] in [A.J.’s] best interest.” Tex. Fam. Code Ann.
§ 161.001(1)(D)–(E), (2) (Vernon Supp. 2005).
          DFPS contends, however, that in terminating Ruiz’s parental rights, the trial
court could have made a number of other implied findings, including an implied
finding that “Ruiz failed to comply with the provisions of a court order that
specifically established the actions necessary for [Ruiz] to obtain the return” of A.J. 
See Tex. Fam. Code Ann. § 161.001(1)(O) (Vernon Supp. 2005). DFPS argues that
because the trial court’s termination of Ruiz’s parental rights as to A.J. can be
supported by evidence establishing, under section 161.001(1)(O), that Ruiz failed to
comply with section 161.001(1)(O) and because Ruiz has not addressed this point in
her appeal, she has waived the issue for our review. 
          In support of its argument, DFPS relies on Thompson v. Texas Dep’t of Family
and Protective Servs., 176 S.W.3d 121 (Tex. App.—Houston [1st Dist.] 2004, pet.
denied). In Thompson, we rejected a father’s argument that “the trial court’s only
basis for termination was under Family Code section 161.001(O) because this was the
only ground for termination recited in the judgment.” Id. at 125. Citing Texas Rule
of Civil Procedure 299a,


 DFPS also asserts that findings of fact may not be recited
in a judgment. DFPS reasons that because the trial court’s findings supporting the
termination are recited in the decree, the trial court did not make any formal findings
that this Court must treat as the sole basis for the trial court’s judgment. See id. 
          Essentially, DFPS is asserting that in every parental termination case,
regardless of any express ground relied upon by the trial court in a termination order,
a reviewing court may consider the sufficiency of the evidence to support termination
of parental rights under any of the nineteen other grounds specified in section
161.001(1) and affirm if the parent fails to challenge on appeal grounds not found in
the termination order but supported by the evidence. Specifically, DFPS asks this
Court to affirm the trial court’s termination of parental rights on the ground that, in
violation of section 161.001(1)(O), Ruiz failed to comply with the provisions of a
court order that established the actions necessary for her to obtain A.J.’s return, even
though the trial court did not make any such express finding in its termination order.           However, this Court, in an en banc opinion, has specifically rejected DFPS’s
argument that we may affirm a trial court’s termination order on the basis of a
subsection of section 161.001, which, although pleaded by DFPS in its original
petition, was not expressly found to have been violated in the decree. Cervantes v.
Texas Dep’t of Family & Protective Servs., No. 01-05-00307-CV, slip op. at 13, 15 
(Tex. App.—Houston [1st Dist.] 2006, no pet. h.). We overruled our previous
holding in Thompson that findings made in a judgment, which are required by statute,
cannot form the basis of an appeal. Id. As we noted in Cervantes, DFPS “appears to
confuse the general rule in civil cases that findings should not be made in the
judgment with the requirement that the findings in section 161.001 of the Texas
Family Code be made in a parental-rights-termination order.” Id. (quoting Vasquez
v. Texas Dep’t of Protective & Regulatory Servs., 190 S.W.3d 189, 194 (Tex.
App.—Houston [1st Dist.] 2005, pet. denied)). Under the Family Code, a trial court
“shall render an order” terminating a parent-child relationship only “[i]f the court
finds by clear and convincing evidence grounds for termination of the parent-child
relationship.” Tex. Fam. Code Ann. § 161.206(a) (Vernon Supp. 2005). As we held
in Vasquez, “a parental rights termination order can be upheld only on grounds both
pleaded by [DFPS] and found by the trial court.” 190 S.W.3d at 194 (stating, “we
decline [DFPS’s] invitation to uphold the trial court’s termination order on a ground
different from that stated in the order.”).        
          The trial court’s “findings” in the termination order in this case, which are
expressly required by section 161.206 of the Family Code and which track the
language of subsections (D) and (E) of section 161.001(1) of the Family Code, are not
“findings of fact” prohibited by Rule 299a. Cervantes, No. 01-05-00307-CV, slip op.
at 13–14. The “findings” simply articulate the trial court’s grounds for terminating
parental rights. Id. Accordingly, we will review the sufficiency of the evidence
presented under the specific statutory grounds found by the trial court in its
termination order.


 See Vazquez, 190 S.W.3d at 194.
Sufficiency of the Evidence
          In her first issue, Ruiz argues that the evidence is legally and factually
insufficient to support the trial court’s termination of parental rights as to A.J.
because DFPS did not present any evidence that (1) Ruiz knowingly placed or
knowingly allowed A.J. to remain in conditions or surroundings which endangered
the physical or emotional well-being of A.J. or (2) Ruiz engaged in conduct or
knowingly placed A.J. with persons who engaged in conduct which endangered the
physical or emotional well-being of A.J.      
          Under section 161.001(1)(D), a court may terminate the parent-child
relationship if the court finds by clear and convincing evidence that the parent has
knowingly placed or knowingly allowed the child to remain in conditions or
surroundings which “endanger” the physical or emotional well-being of the child. 
Tex. Fam. Code Ann. § 161.001(1)(D). Under section 161.001(1)(E), a court may
terminate the parent-child relationship if the court finds by clear and convincing
evidence that the parent has engaged in conduct or knowingly placed the child with
persons who engaged in conduct that “endangers” the physical or emotional
well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(E). “Endanger” means
to expose to loss or injury or to jeopardize. Tex. Dep’t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987); In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort
Worth 2003, no pet.). The term means “more than a threat of metaphysical injury or
the possible ill effects of a less-than-ideal family environment.” Boyd, 727 S.W.2d
at 533. However, it is not necessary that the conduct be directed at the child or that
the child actually suffer injury. Id.; see also Robinson v. Texas Dep’t of Protective
and Regulatory Servs., 89 S.W.3d 679, 686 (Tex. App.—Houston [1st Dist.] 2002,
no pet.). 
          Under section 161.001(1)(D), “it is necessary to examine evidence related to
the environment of the child[] to determine if the environment was the source of
endangerment to the child’s[] physical or emotional well-being.” In re J.T.G., 121
S.W.3d at 125; see also In re D.J.J., 178 S.W.3d 424, 429 (Tex. App.—Fort Worth
2005, no pet.) (“The phrase ‘conditions or surroundings’ in section 161.001(1)(D)
refers only to the acceptability of the child’s living conditions and does not concern
the conduct of the parents toward the children); In re U.P., 105 S.W.3d 222, 236 n.7
(Tex. App.—Houston [14th Dist.] 2003, pet. denied). In contrast, “[u]nder section
161.001(E), the danger to a child must arise solely by the parent’s conduct established
by the parent’s actions or by the parents failure to act.” Robinson, 89 S.W.3d at 686. 
“The relevant inquiry is whether evidence exists that the endangerment of the child’s
physical [or emotional] well being was the direct result of the parent’s conduct,
including acts, omissions, or failures to act,” and termination under this section “must
be based on more than a single act or omission.” In re J.T.G., 121 S.W.3d at 125. 
Rather, “a voluntary, deliberate, and conscious course of conduct by the parent is
required.” Id. The focus of subsection (1)(E), in contrast to subsection (1)(D), is
clearly on conduct that actually endangers the well-being of the child.
          In support of termination under section 161.001(1)(D) and (E), DFPS cites
evidence that a referral was made that A.J. received cigarette burns that Ruiz could
not explain and that Ruiz left A.J. with his great grandmother for extended periods
of time while Ruiz’s whereabouts were unknown. DFPS also asserts that the
evidence showed that Ruiz took A.J. for two months after the initial referral, that
DFPS could not find Ruiz for a “substantial period of time,” and that DFPS was
“unable to promptly investigate the burn or remove [A.J.].” DFPS concludes that a
reasonable trier of fact could have concluded that Ruiz went to an unknown location
after the referral to DFPS so that the burn would heal before an investigation could
be conducted. DFPS also asserts that Ruiz “did not directly say that the marks on
[A.J.] were not cigarette burns” and that a reasonable trier of fact could have
concluded Ruiz was attempting to hide the “actual nature” of A.J.’s injuries. Second,
DFPS cites evidence that when A.J. was placed in the Chappa home, Ruiz was found
alone with A.J., in violation of a stipulation to the placement, and that A.J. had a
“very soaked diaper,” bruising, and a gash above of his eye. DFPS asserts that a
reasonable trier of fact could have disbelieved Ruiz’s explanation for the injuries and
could have believed that Ruiz’s treatment of the gash was inadequate. Based on this
evidence, DFPS argues that there was legally and factually sufficient evidence to
support the finding under section 161.001(1)(D) that Ruiz endangered A.J. and
knowingly placed or knowingly allowed A.J. to remain in conditions that endangered
his well being.
           Also, in regard to the trial court’s finding under section 161.001(1)(E), DFPS
focuses on Ruiz’s admission that she used marijuana on April 14, 2003, when her
parental rights were in jeopardy and when she may have been pregnant and on bed
rest for a high risk pregnancy with another child who was not the subject of the
termination proceeding. DFPS asserts that “a mother’s use of drugs during a recent
pregnancy may be considered endangering a child.” DFPS contends that this
evidence, considered with the above evidence that Ruiz caused or allowed injuries to
A.J. while he was in her care, supports a finding that Ruiz engaged in conduct or
knowingly placed the child with persons who engaged in conduct which endangered
the physical or emotional well-being of the child.
          In response to the trial court’s findings under subsections (D) & (E), Ruiz cites
to the evidence showing that she placed A.J. in Hernandez’s care in the beginning of
April 2003 until she could find “a better place for [them] to live” and that she had an
agreement with Hernandez to leave A.J. with her. She stated that she never left A.J.
with anyone else. Ruiz visited A.J. when she was off from work and school, at least
a few times during the week. She asserts that there is simply no testimony in the
record which indicates that she left her child in conditions or surroundings which
endangered his physical or emotional well being.
          Ruiz also notes that there was no testimony that the alleged cigarette burns
occurred while the child was in Ruiz’s care and that she denied that the burns
occurred while the child was in her care. She also asserts, in regard to the alleged
gash on A.J’s eye, that “children do sustain injuries in the normal course of their daily
activities” and that there was no evidence “to indicate that the cut was sustained in
any other manner.”
          Our review of the evidence reveals that the only direct testimony related to the
initial referral was provided by Brown, who stated that “it was alleged [that] there
were cigarette burns on [A.J.’s] arm and that [Ruiz] could not give a consistent
explanation for those said cigarette burns.” Thus, the evidence presented at trial does
not indicate who made the referral or if the person who made the referral was alleging
that Ruiz was responsible for the alleged burns. Rather, the record only indicates that
Ruiz “could not explain” the alleged burns. Furthermore, a reasonable fact finder
could only have considered Ruiz’s testimony to constitute a denial that she was
responsible for the alleged burns. In fact, Ruiz testified that the burns, if any, were
incurred while A.J. was in the care of Hernandez or another person. Additionally,
the record does not establish, much less support an inference, that after the referral,
Ruiz took A.J. from Hernandez’s home for a two month period to an unknown
location for the purpose of concealing A.J.’s burns from a DFPS investigator and
waiting for the burns to heal. Brown only testified that A.J. “was removed after a
period of time because Ruiz took [A.J.] from the care of the grandmother,” that they
didn’t know where [A.J.] was, and that, “about two months later, [A.J.] was removed
and was returned.” Brown’s testimony concerning the initial referral and subsequent 
removal of A.J. simply does not establish, or even support an inference, of what
DFPS alleges. Instead, DFPS’s evidence only indicates that A.J. was removed two
months after the initial referral. Ruiz testified, to the contrary, that around the time
of the initial referral, she took A.J. for approximately one week from the Hernandez
home. Finally, there is no testimony from Brown or from any other witness
establishing that when Ruiz removed A.J. from the Hernandez home, she did so in
violation of a court order or family services plan that had already been entered in this
case or in violation of her informal agreement with Hernandez regarding A.J.’s living
arrangements. Significantly, there is no evidence that at the time DFPS alleges that
Ruiz took A.J. from the Hernandez home in an effort to conceal his injuries that Ruiz
even had knowledge that a referral had been made to DFPS. 
          However, there is evidence that Ruiz was found in the Chappa home with A.J.
in violation of the terms of A.J’s placement with Chappa and that when Brown visited
A.J. at Chappa’s home he was in a “very soaked diaper” and had some bruising and
a gash above of his eye. Ruiz testified that she treated the gash with neosporin and
alcohol and that the gash did not appear to be too serious to either Ruiz or Chappa.
DFPS asserts that, based on this evidence, “a reasonable trier of fact could have
inferred that, even though Ruiz provided an attempt at her own medical care for
[A.J.], [Ruiz] nevertheless allowed [A.J.] to remain in surroundings or circumstances
that endangered [A.J.’s] physical well-being and failed to ameliorate the cause of the
injuries in the first place.” 
          In support of its argument that, based on this evidence, there was legally and
factually sufficient evidence to support a finding that Ruiz endangered A.J. and
knowingly placed or knowingly allowed A.J. to remain in conditions that endangered
his well being, DFPS cites In re J.P.B., 180 S.W.3d at 574. However, In re J.P.B. is
easily distinguishable and the facts supporting termination were much more
substantial. In that case, (1) the father testified that he and his wife shared in the
child’s care; (2) a July 7, 2002 x-ray revealed that the child had rib fractures that
likely occurred between July 5, 2002 and July 7, 2002; (3) the father testified that he
and his wife were home alone with the child on those dates; (4) DFPS’s expert
testified that twenty-one fractures, which were approximately one to four weeks old,
were detected in the child’s July 19, 2002 survey; and (5) there was expert testimony
that the child’s injuries were likely caused by excessive force such as abrupt yanking,
pulling, or punching, that a parent should have known that something was wrong with
a child, and that a parent should have noticed high-pitched screams from the child due
to the fractures. Id. at 573. The Texas Supreme Court stated that even though
undisputed evidence showed that the father sought medical care for the child multiple
times and that the child’s doctors initially failed to diagnose the fractures, a
reasonable jury could infer, based on evidence that the child “sustained twenty-one
fractures during a time when he was under [the father’s] care,” that the fractures
“were likely caused by [] abusive treatment,” that “the fractures did not occur all at
once and were the result of ongoing mistreatment,” and that the father “allowed the
child to remain in surroundings that endangered his physical well-being” and
“knowingly failed to ameliorate the underlying cause” of his injuries. Id. at 574. 
          Unlike the evidence presented in In re J.P.B, the evidence in this case showed,
or would permit a reasonable inference, that the referral to DFPS was initiated by
non-specific allegations that A.J. received a cigarette burn, that Ruiz left A.J. for
extended periods of time with his paternal great grandmother while her whereabouts
were unknown, and that A.J. was found alone with Ruiz in the Chappa home, in
violation of a stipulation, with a soiled diaper, bruising, and a gash above his eye. 
There was no evidence presented at trial that Ruiz caused or was present when the
original injury was sustained. There was also no evidence that the injuries incurred
at the Chappa home were caused by abusive treatment. Instead, the only evidence
concerning these injuries was presented by Brown, who merely stated that the gash
above A.J’s eye “looked like it should have some medical attention” above and
beyond the basic first aid treatment applied by Ruiz. There was no evidence
presented that Ruiz’s attempt at treating the gash was ultimately deemed inadequate
or that Ruiz endangered A.J.’s physical or emotional well being through her allegedly
deficient treatment. Accordingly, we hold that the evidence was legally insufficient
for a reasonable fact finder to form a “firm belief or conviction” that Ruiz knowingly
placed or knowingly allowed A.J. to remain in conditions or surroundings that
endangered his well-being. We further hold that the trial court erred in terminating
Ruiz’s parental rights on the ground that she violated section 161.001(1)(D). 
          We next turn to the finding in the termination decree under section
161.001(1)(E). Again, we note that under this section, we must determine whether
there is evidence that the endangerment of the child’s physical or emotional well
being was the direct result of the parent’s conduct. Robinson, 89 S.W.3d at 686. In
addition to the above cited conduct, DFPS notes that Ruiz admitted that she smoked
marijuana in mid April 2003, when her rights to A.J. were in jeopardy, and that other
evidence suggests that Ruiz could have been pregnant with another child at the time. 
Ruiz offered contradictory testimony as to whether she may have been pregnant at the
time, but we agree that the evidence was sufficient to permit a fact finder to make this
inference. We also agree that, in some circumstances, narcotics use may give rise to
termination under section 161.001(1)(E). See Robinson, 89 S.W.3d at 686–87. 
However, the evidence in this case concerning Ruiz’s alleged narcotics use was
extremely limited and does not support a finding, by itself, that Ruiz engaged in
conduct or knowingly placed A.J. with persons who engaged in conduct that
endangered A.J.’s physical or emotional well being. Furthermore, we note that
termination under this section “must be based on more than a single act or omission,”
and here there is no direct evidence that Ruiz had an ongoing narcotics problem that
would support a finding under this section. Ruiz contended at trial that she was
“clean,” and, other than conceding that she had past “experience with alcohol and
drugs,” she only specifically admitted to smoking marijuana on one occasion; there
was no evidence presented to contradict her testimony. More importantly, there is no
evidence that she used narcotics when she was caring for A.J. or that A.J. was in her
presence when she used narcotics. In fact, the testimony indicates that A.J. was likely
in the care of Hernandez in April 2003. The evidence of Ruiz’s narcotics use,
together with the other evidence cited by DFPS, simply does not establish “a
voluntary, deliberate, and conscious course of conduct” sufficient to support a
termination finding under section 161.001(1)(E). See In re D.J.J., 178 S.W.3d at 430
(stating that there was no evidence that father’s use of narcotics that resulted in arrest
and imprisonment endangered child’s physical or emotional well being). 
Accordingly, we hold that the evidence was legally insufficient for a reasonable fact
finder to form a “firm belief or conviction” that Ruiz engaged in conduct or
knowingly placed A.J. with persons who engaged in conduct which endangered the
physical or emotional well-being of A.J. We further hold that the trial court erred in
terminating Ruiz’s parental rights on the grounds that she violated section
161.001(1)(E). 
          We sustain Ruiz’s first issue.



                                                         Conclusion
          Having held that the trial court erred in terminating Ruiz’s parental rights on
the grounds that she violated section 161.001(1)(D) and (E), we need not address
Ruiz’s second issue in which she contends that the evidence was legally and factually
insufficient to support the trial court’s findings that termination of the parental
relationship was in A.J.’s best interest. 
          We reverse the portion of the of the decree terminating the parent-child
relationship between Ruiz and A.J. and we render judgment that her parental rights
to A.J. are not terminated.  
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Jennings, Hanks, and Higley.